**AMERICAN HOME ASSURANCE CO.,**
Plaintiff, Appellee,

v.

**LIBBEY–OWENS–FORD CO.,**
Defendant, Appellant.

**AMERICAN HOME ASSURANCE CO.,**
Plaintiff, Appellant,

v.

**LIBBEY–OWENS–FORD CO.,**
Defendant, Appellee.

Nos. 85–1373, 85–1411.

United States Court of Appeals,
First Circuit.

Argued Nov. 13, 1985.

Decided March 18, 1986.

As Modified on Denial of Rehearing
June 16, 1986.

Erik Lund, with whom David J. Hatem, Posternak, Blankstein & Lund, James E. Grumbach, and Morrison, Mahoney & Miller, Boston, Mass., were on brief for American Home Assur. Co.

Michael A. Nims, Jones, Day, Reavis & Pogue, Cleveland, Ohio, with whom James M. Oathout, Sibley P. Reppert, and Herrick & Smith, Boston, Mass., were on brief for Libbey-Owens-Ford Co.

Before COFFIN and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

* Of the District of Massachusetts, sitting by designation.

COFFIN, Circuit Judge.

This case turns on the interpretation of the provisions of a comprehensive general liability policy. The Libbey-Owens-Ford Company (LOF) appeals from a summary judgment of the district court finding that the American Home Assurance Company, issuer of LOF's excess liability insurance, is not liable for any of LOF's liability damages. For the reasons set forth below, we reverse and remand for trial.

## I. BACKGROUND FACTS

In 1967, the John Hancock Insurance Company contracted with I.M. Pei Associates for the design and construction of an office building in Boston, Massachusetts. The Gilbane Building Company undertook to construct the building and entered into a subcontract with the H.H. Robertson Company to construct the glass surface of the structure. The appellant, the Libbey-Owens-Ford Company (LOF), contracted with Robertson to provide approximately 10,344 "Bondermetric Vari-Tran" (BVT) windows for the building.

Installation of the windows began in April 1971 and continued through January 1983. From November 1972 through January 1973, substantial breakage of the windows occurred following major storms. In late January 1973, I.M. Pei, architect of the Hancock Building, concluded that a "clear and present danger" to the public existed because of the window breakage and an inspection of the BVT windows was initiated by Hancock. In June 1973, Pei concluded that the windows in the lower half of the building did not conform to contract specifications and ordered them replaced. In September 1973, Pei concluded that the windows in the upper half of the building did not conform to the contract and ordered those windows replaced as well. Replacement of the windows resulted in various increased construction and operating costs and delayed the occupancy date of the Han-

cock Building from April 1, 1973 to June 1, 1975.

In September 1975, Hancock sued LOF, Robertson, Gilbane, Pei and others in Massachusetts state court. Hancock alleged various items of damage totalling approximately $90 million. For purposes of this litigation, the claims for damages may be grouped into two categories. The first category consists of approximately $11 million attributed to the immediate costs of removing and replacing the BVT windows.[1] The second category consists of approximately $88 million of consequential losses suffered by Hancock as the result of the need to replace the windows. Among these damages was a claim of $25.9 million for loss of rentals and deprivation of use of the Hancock Building for thirty-three months.[2] In August 1981, most of the parties joined in a settlement with Hancock for approximately $30 million. LOF contributed $26 million to this settlement amount.

During the three year period commencing April 1, 1969, LOF carried general liability insurance under a primary policy and an excess policy. The primary policy·was with Aetna Casualty and Surety Company and provided coverage for up to $1,000,000 for each policy year. The excess or umbrella liability policy was issued by Commercial Union Assurance Company of Boston ("Commercial Union") and provided coverage of $9,000,000 for each policy year. In April 1972, LOF renewed both policies, increasing Commercial Union's coverage to $10,000,000. In addition, effective June 1972, LOF purchased a $10,000,000 second layer excess policy from American Home Assurance Company (American Home).

Aetna, and subsequently Commercial Union, defended LOF in the action brought by Hancock.[3] At the time of the settlement with Hancock, Commercial Union had already expended part of LOF's policy coverage on defense costs in the Hancock suit and claims brought by other parties. After negotiations with LOF, Commercial Union

---

**1.** These claims were for the removal and replacement of the windows ($6,748,000), interim removal and boarding up of windows ($1,296,-000), and construction overhead costs during removal and replacement ($3,082,000).

**2.** The other claims were: costs of consulting, inspection, etc. in connection with the decision to replace ($1,283,000); escalation of prices for other construction caused by the delay ($1,167,-000); modification to the heating-ventilation-air

conditioning system (HVAC) due to replacement of new windows ($216,000); and increased operating expenses of the new HVAC system as the result of higher conductivity of new windows ($50,000,000).

**3.** Although Commercial Union initially disclaimed coverage under its policy, it did undertake defense of the Hancock claim and ultimately paid LOF following negotiations regarding the policy.

paid out the balance of LOF's 1972–73 policy year coverage, totalling $7,643,272, as a contribution to the settlement between LOF and Hancock. LOF's out-of-pocket cost for the settlement was thus reduced to approximately $18 million.

LOF also requested contribution from American Home, issuer of its second layer excess policy. American Home's policy terms were identical to those of Commercial Union. American Home, however, disclaimed coverage and in June 1981, shortly before the settlement with Hancock, filed this action seeking a declaratory judgment that its policy did not cover any of the claims asserted by Hancock.

The district court found that only the loss of use claim of $25.9 million was covered under the American Home policy. Because the record did not disclose how LOF's settlement payment of $26 million had been apportioned among the several Hancock claims, the district court assumed that the percentage of the $26 million settlement amount that could be attributed to the loss of use claim was the same percentage the loss of use claim held to the overall claim amount—that is, 29% or $7,507,913.[4] The district court then assumed that the entire amount paid by Commercial Union, $7,643,272, was attributable solely to the loss of use claim because that was the only claim Commercial Union would have been legally obligated to pay had it litigated its coverage. Given these calculations, the district court found that LOF had already been overly compensated for its only covered claim[5] and that there was no excess liability to be borne by American Home.

LOF appeals from the district court's interpretation of the American Home policy and from the court's apportionment analysis. American Home cross-appeals from the district court's conclusions that loss of use may be covered without accompanying physical injury and that the relevant occurrence fell within the time period covered by the American Home policy.

## II. POLICY COVERAGE

### A. *Property Damage*

American Home agreed to indemnify LOF for all sums that LOF became obligated to pay, by law or by agreement, "because of ... property damage as hereinafter defined."[6] Property damage was defined in the policy as "physical injury to, or physical destruction of, tangible property, including the loss of use thereof." The policy expressly excluded claims made against LOF for damage to LOF's own products or for the improper performance or design of LOF's products.[7]

LOF maintains that the exclusion for "damage to the named insured's products arising out of such products" excludes only coverage for the actual repair and replacement costs of its product, the BVT windows. Thus, according to LOF, only Hancock's claim of $6,748,000 directly attributable to the removal and replacement of the failed windows is excluded under the policy.[8] By contrast, all Hancock's claims for

---

4. The $25.9 million loss of use claim represented 29% of Hancock's total claim of $89.7 million. Of the $26 million paid by LOF, therefore, 29% or $7,507,913, was attributed to the loss of use claim.

5. As noted, according to the district court's calculations, LOF was eligible to receive insurance coverage for only $7,507,913—the portion of its settlement amount that could be attributed to the loss of use claim. Commercial Union's payment of $7,643,272 was therefore actually $135,000 above that covered amount.

6. In the exact language of the policy, American Home agreed to:

"indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon him by law or liability assumed by him under contract or agreement for damages, and expenses, all as

included in the definition of "ultimate net loss", because of:

(b) property damage, as hereinafter defined."

7. The relevant exclusions are the following: "This policy does not apply ... (c) to claims made against the Insured: (i) for damage to the Named Insured's products arising out of such products or any part of such products;

(iv) for improper or inadequate performance, design or specification, but nothing herein contained shall be construed to exclude claims made against the Insured for personal injuries or property damage (other than property damage to a product of the Insured) resulting from improper or inadequate performance, design or specification."

8. As noted above, we include certain of Hancock's other claims as directly attributable to the repair and replacement of the windows. *See supra* n. 1.

consequential damages stemming from the broken windows are covered under this reading of the policy. The policy expressly covers all damages *"because of ...* property damage" (emphasis added) and, LOF argues, it therefore covers all consequential damages *resulting from* covered property damage. According to LOF, breakage of its windows constitutes the required "property damage" because such breakage meets the policy definition of "physical injury to tangible property".

The district court did not address the argument that breakage of the LOF windows could constitute "property damage" as contemplated by the policy and that Hancock's claims were therefore covered as consequential losses flowing from such damage. Rather, the district court stated that LOF must be arguing that "a variety of intangible items of loss" were themselves included under the term "property damage". *American Home Assur. Co. v. Libbey-Owens-Ford Co.*, 588 F.Supp. 766, 768 (D.Mass.1984). The court noted that although a number of courts have held that intangible losses, such as loss of use or diminution of value, are "property damage", *see, e.g., McDowell-Wellman Eng. v. Hartford Acc. and Indem.*, 711 F.2d 521, 525–26 & n. 7 (3rd Cir.1983) (and cases cited therein); *Hauenstein v. St. Paul-Mercury Indemnity Co.*, 242 Minn. 354, 65 N.W.2d 122, 124–26 (1954), all such decisions had interpreted policy language defining property damage as "injury to tangible property" rather than *"physical* injury to tangible property." In cases in which courts have interpreted more recent policies in which property damage is defined as "physical" injury to tangible property, such courts have held that intangible damages, such as diminution in value, are not considered property damage. *See, e.g., Wyoming Sawmills v. Transportation Ins. Co.*, 282 Or. 401, 578 P.2d 1253 (1978); *Federated Mutual Insurance Co. v. Concrete Units, Inc.*, 363 N.W. 751, 757 (Minn. 1985).

We agree with the district court's analysis on this issue, although we decide the coverage issue on different grounds. The critical difference in policy language is the result of a 1973 revision of the Comprehensive General Liability Policy, used by most insurance companies, which expressly added the modifier "physical" injury to the definition of "property damage" in order to restrict recovery for intangible losses. *See generally,* Note, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy,"* 68 Minn.L.Rev. 795, 800–813 (1984); Tinker, *Comprehensive General Liability Insurance—Perspectives and Overview,* 25 Fed'n Ins. Counsel Q. 217, 224–26 (1975). Under this policy language, some physical injury to tangible property must be shown in order to trigger coverage.[9]

Because the American Home policy explicitly defined property damage as "physical injury" to tangible property, and because none of Hancock's claims entailed or resulted from physical damage to the *Hancock Building,* the district court concluded that none of Hancock's claims for consequential damages resulting from the breakage of LOF's windows were covered under the policy. The court did find coverage for the loss of use claim because the policy defined property damage as "physical injury to ... tangible property, *including the loss of use thereof"* (emphasis added). The court noted that, although the word "including" could suggest that loss of use must be traced to some physical injury, it was more reasonable to view the additional phrase "loss of use thereof" as including any "loss of use of tangible property", independent of physical injury to that property. The court also noted that the American Home policy was significantly different from other policies that explicitly cover only "physical injury to tangible property ... including loss of use thereof *resulting therefrom "* (emphasis added). *American Home,* 588 F.Supp. at 769–71.

■ We think that the district court was correct in holding that the American Home policy did not require tangible property to suffer physical injury in order for a loss of use claim to be covered. Nevertheless, we conclude that the court erred in its initial interpretation of the American Home policy. Although the plain language of the policy does require that some physical injury to tangible property must occur, other than for loss of use claims, the policy language does not preclude the possibility that physical injury to the insured's own property can constitute such property damage.

---

**9.** The only exception is when the claimant is seeking damages for loss of use, as we explain in the following paragraph.

Under this reading of the policy, consequential damages suffered as a result of physical injury to any product, including that of the insured, would be covered.[10] Such a reading is a reasonable construction of the policy and, under general principles of insurance law, a reasonable construction that affords coverage for the insured should be adopted. *See River Services Co. v. Hartford Acc. & Indem. Co.,* 449 F.Supp. 622, 626 (N.D.Ohio 1977).[11] Indeed, any alternative reading resulting in non-coverage for the insured would actually require us to add language to the policy against the insured, standing on its head the general insurance principle that policies are to be strongly construed against the insurer, *see, e.g., Essex House v. St. Paul Fire & Marine Insurance Co.,* 404 F.Supp. 978, 986 (S.D.Ohio 1975).

American Home agreed to indemnify LOF for all sums that LOF became obligated to pay *"because of ...* property damage" (emphasis added). As noted above, LOF argues that the policy thus provides coverage not only for property damage, but also for consequential damages *resulting from* property damage. American Home does not address the construction of this language in its brief and, indeed, it is one reasonable interpretation of the phrase "because of ... property damage."

■ A number of courts have read the clause "because of property damage" to include consequential losses attributable to such property damage. *See, e.g., Globe Indem. Co. v. People,* 43 Cal.App.3d 745, 750–51, 118 Cal.Rptr. 75, 79 (1974) (fire suppression costs expended by the state to prevent further damage to property are damages "because of" property damage); *American Economy Insur. Co. v. Commons,* 26 Or.App. 153, 552 P.2d 612, 613–14 (1976) (same).[12] Although a number of courts, concluding that consequential losses from property damage are covered, have relied not only on the general meaning of the term "because of", but also on the

specific definition of property damage that existed in the pre-1973 Comprehensive General Liability Policy, *see, e.g., Yakima Cement Products Co. v. Great American Insur. Co.,* 22 Wash.App. 536, 590 P.2d 371, 377 (1979), *rev'd on other grounds,* 93 Wash.2d 210, 608 P.2d 254 (1980); *Safeco Insur. Co. v. Munroe,* 165 Mont. 185, 527 P.2d 64, 68 (1974), even the post-1973 version of the Comprehensive General Liability Policy, which restricts property damage to *"physical* injury to tangible property" has been interpreted by courts and commentators to cover consequential damages resulting from such physical damage. *See Federated Mutual Insurance Co. v. Concrete Units, Inc.,* 363 N.W.2d 751, 757 (Minn.1985); *Wyoming Sawmills, Inc. v. Transportation Ins. Co.,* 282 Or. 401, 578 P.2d 1253, 1256–57 (1978); Note, *Liability Coverage,* 68 Minn.L.Rev. at 817–820; Tinker, *Comprehensive General Liability Insurance,* 25 Fed'n Ins. Counsel Q. at 254. Since the term "because of property damage" can reasonably be interpreted to mean all liability arising from such damage, an insurance company wishing to exclude consequential damages should use specific language to that effect. *United Properties, Inc. v. Home Ins. Co.,* 311 N.W.2d 689, 692 (Iowa App.1981).

The fact that consequential damages from property damage are covered under the post-1973 version of the Comprehensive General Liability Policy (CGLP) does not mean that all consequential damages are necessarily covered under that standard policy. The CGLP states that the insurer will pay all sums the insured becomes obligated to pay as damages "because of ... property damage *to which this insurance applies"*. That policy then states "[t]his insurance does not apply ... to property damage to the named insured's products."[13] Thus, as a leading commentator of the CGLP notes, such a policy would cover only consequential damages resulting from "property damage to which the policy

10. Under this interpretation, of course, the loss of use suffered by Hancock would be covered as part of these general consequential damages, and not under the policy's specific reference to loss of use.

11. The district court held that Ohio law governs the contract. This ruling has not been appealed.

12. Similarly, courts have often found that the clause "because of personal injury" covers consequential losses arising from such personal injury. *See, e.g., Commercial Union Ins. Co. v. Gonzalez Rivera,* 358 F.2d 480, 484 (1st Cir. 1966); *Lumberman's Mut. Casualty Co. v. Yeroyan,* 90 N.H. 145, 146, 5 A.2d 726, 727 (1939); 8A J. Appleman & J. Appleman, *Insurance Law and Practice,* § 4893, at 59 (rev. ed. 1976).

13. For example, LOF's primary insurance policy with Aetna adopts this language of the Comprehensive General Liability Policy.

applies", *Tinker, supra* at 254, and therefore consequential damages arising from damage to the insured's own product, property explicitly excluded from the policy's application, would not be covered.

The importance of the phrase "to which this insurance applies" is reflected in the New Jersey Supreme Court opinion in *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (1979). Rejecting the argument that direct and consequential damages resulting from an insured's faulty workmanship were covered under a general liability policy, the court stated: "The qualifying phrase, 'to which this insurance applies' underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for the type of damage provided for in the policy. The limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded." *Weedo*, 405 A.2d at 790. In *Weedo*, the insurance policy expressly stated that "this insurance does not apply (n) to property damage to the named insured's products ... (o) to property damage to work performed by or on behalf of the named insured." *Weedo*, 405 A.2d at 792. *See also Federated Mutual Insurance Co. v. Concrete Units, Inc.*, 363 N.W.2d 751 (Minn.1985) (interpreting policy with the phrase "property damage to which this insurance applies").

The American Home policy, however, does not follow the language of the Comprehensive General Liability Policy. In its policy, American Home agreed to indemnify LOF for all sums which LOF would become obligated to pay "because of ... property damage, *as hereinafter defined*". Under the section of "Definitions", the policy states: "The term 'property damage' shall mean physical injury or physical destruction of, tangible property, including the loss of use thereof." There is no restriction in this definition regarding whose property must suffer damage in order to qualify as "property damage". Thus, unless some exclusion applies to qualify this provision, the plain language of the policy covers consequential damages arising from physical injury to any tangible property, including the property of the insured.

American Home argues that an exclusion does apply to qualify the definition. The two relevant exclusions are those which deny coverage for claims made against the insured "for damage to the Named Insured's products arising out of such products" and "for improper or inadequate performance, design, or specification." [14] We conclude, however, that neither of these provisions is sufficient to exclude coverage for all consequential damages arising from physical damage to an insured's product. These provisions do exclude coverage for any damages resulting from the actual repair or replacement of an insured's product. *See Todd Shipyards Corp. v. Turbine Services, Inc.*, 674 F.2d 401, 423 (5th Cir.1982); *Western Casualty and Surety Co. v. Polar Panel Co.*, 457 F.2d 957, 960 (8th Cir.1972); *Eastern Foundation Co. v. Creswell*, 475 F.2d 351, 354 (D.C.Cir.1973). Thus, in this case, the policy would expressly exclude coverage for any costs associated with the repair and replacement of LOF's product, its BVT windows. The exclusions do not, however, expressly exclude coverage of any further consequential losses that may result from the breakage of LOF's products. [15]

The rationale that courts and commentators have given for these exclusions, usual-

---

14. See n. 7 for the full text of these exclusions.

15. Indeed, the full text of the "design exclusion" provision can be read as supporting coverage of consequential losses. The provision excludes coverage for claims made against the insured "for improper or inadequate performance, design, or specification, but nothing herein contained shall be construed to exclude claims made against the Insured for personal injuries or property damage (other than property damage to a product of the Insured) resulting from improper or inadequate performance, design or specification." According to this exclusion, therefore, if a design defect causes property damage to the insured's own product, that particular damage is not covered. This is consonant with the first exclusion denying coverage for damage to the insured's own product. However, a situation in which the design defect causes damage to the insured's property, which then causes damage to *other* property, is somewhat similar to a situation in which the insured's product causes injury to another party's body or property—a situation for which the exception to the exclusion expressly provides coverage.

ly referred to as the "business-risk exclusions", support the conclusion that allowing coverage for consequential damages from an insured's product is at least a reasonable construction of the policy. These exclusions are designed to exclude from coverage the ordinary contractual risk that a product will fail to live up to contract demands and will require repair or replacement. *See e.g., Weedo v. Stone-E-Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 791 (1979); Tinker, *Comprehensive General Liability Insurance,* 25 Fed'n Ins. Counsel Q. at 223–26; Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb.L.Rev. 415, 441–442 (1971). A general liability policy is not designed to act as insurance for these ordinary contract failures, but rather to protect the insured in the event the insured's product causes damage to other property or persons. *See generally,* Henderson, *Insurance Protection,* 50 Neb.L.Rev. at 441 (the risk intended to be insured against is "the possibility that the ... products ... of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable.") As Judge Gignoux pointed out in *Honeycomb Systems, Inc. v. Admiral Ins. Co.,* 567 F.Supp. 1400, 1408 (D.Maine 1983), the business-risk exclusions "are designed to make the insured responsible for predictable and limited business risks, while protecting the insured against catastrophe."[16]

In our case, LOF must bear all costs associated with the repair and replacement of its own product. Its policy with American Home does not, however, expressly exclude coverage for the consequential damages that physical injury to its windows may set in motion. Although most courts have not had occasion to hold that physical injury to an insured's own product can constitute "property damage", because such a particular claim has not often been raised,[17] there is no express language in the American Home definition of property damage to preclude such a reading. Further, unlike many other policies that follow the language of the Comprehensive General Liability Policy, there is no clause in the American Home policy that restricts consequential damages to property damage "to which this insurance applies." Under general insurance principles, exclusionary clauses must state clearly what items are to be excluded and any ambiguity is to be interpreted strictly in the insured's favor. *See e.g., River Services Co. v. Hartford Accident and Indemnity Co.,* 449 F.Supp. 622, 626 (N.D.Ohio 1977); *Essex House v. St. Paul Fire & Marine Insurance Co.,* 404 F.Supp. 978, 986 (S.D.Ohio 1975). Given that American Home's current policy is at best ambiguous, and at worst clearly applicable to cover LOF's damages, we hold that the policy covers consequential losses stemming from physical injury to LOF's products. Thus, although American Home's policy does not cover the $11 million applicable to repair and replacement of LOF's windows, it does cover Hancock's

**16.** Judge Gignoux quoted *Weedo* for the rationale underlying the distinction between normal business risks and catastrophic risks:

"The consequence of not performing well is part of every business venture; the replacement and repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers....

There exists another form of risk in the insured-contractor's line of work, that is, injury to people and damage to property caused by faulty workmanship. Unlike business risks of the sort described above, where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities. While it may be true that the same neglectful craftmanship can be the

cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting. *Weedo v. Stone-E-Brick, Inc.,* 405 A.2d at 791." *Honeycomb,* 567 F.Supp. at 1408, n. 5.

**17.** It should be noted that under policies which did not define property damage as *"physical injury to tangible property",* there was usually little need to raise such a claim because courts often held that various intangible, consequential losses were covered "property damage." *See supra* p. 26. Under more recent policies which include the requirement of physical injury, the policy usually follows the language of the Comprehensive General Liability Policy which expressly states that "this insurance does not apply" to damage to the named insured's products. As we have noted, the American Home policy does not adopt this particular language.

claims for consequential damages resulting from physical damage to LOF's windows.[18]

## B. *The "Sistership" Exclusion*

The district court concluded that policy exclusion (c)(iii), a standard exclusion known as the "sistership exclusion", applied to this case. This provision excludes coverage for:

> "damage for the withdrawal, inspection, repair, replacement, or loss of use of the Named Insured's products ... or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected deficiency therein."

The district court correctly noted that the sistership exclusion does not apply to a product that has failed, but only to a "sister" product withdrawn after failure of the first product. *See, e.g., Bigelow-Liptak Corp. v. Continental Insurance Co.,* 417 F.Supp. 1276, 1281–82 (E.D.Maine 1976); *Honeycomb,* 567 F.Supp at 1407 (and cases cited therein); R. Long, *Law of Liability Insurance* at § 11.11 (1979). Thus, the court concluded, any covered damages that arose from windows that actually failed would not be excluded by this provision, but any damages attributable to windows that did not fail, but were rather removed by Pei, would be excluded. *American Home,* 588 F.Supp. at 771. The court then found that the only covered damage claim—that of loss of use—was all attributable to windows that actually failed.

We have some doubts as to whether the sistership exclusion applies to our case. The injury for which Hancock brought suit—consequential damages arising from the breakage and replacement of the windows—could be seen as effectively occurring when the first windows broke and Pei concluded that the windows presented a "clear and present danger" to the public. Withdrawal of the remaining windows would then not be a curative measure taken to prevent further injury, but rather would be a continuation of the injury that had already occurred. All of the windows would then be considered as one product and no "sister" products would be involved at all.

We are not required, however, to decide definitively whether the sistership exclusion is applicable to our case. The district court assumed, for purposes of summary judgment, that all of the loss of use claim was attributable to the windows that failed and thus no part of the loss of use claim was excluded by the sistership exclusion. We find this assumption to be perfectly valid, particularly because the view most favorable to LOF is to be adopted in considering summary judgment for American Home. Because of its interpretation of the American Home policy, the district court had no need to analyze Hancock's other claims apart from that of loss of use. Nevertheless, the same reasoning of the district court can apply to the other claims. Thus, for purposes of summary judgment, we assume that the remaining Hancock claims are also attributable to the windows that actually failed. Hence, even if the sistership exclusion should apply to this case, we assume that it does not exclude coverage for any of the claimed damages.

## C. *Date of Occurrence*

The district court concluded that the "occurrence" that caused the loss of use fell within the time frame of the American Home policy. The policy defines an occurrence as

> "(a) an accident or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in ... property damage ... neither expected nor intended from the standpoint of the insured."

The court noted that the occurrence—the failure of the windows—extended over a period of time, including a period after the expiration of the American Home policy in April 1973. For purposes of policy coverage, however, the court held that "the date of occurrence is the date that Hancock knew or should have known that the building was fundamentally flawed and incapable of fulfilling its intended purpose." The court noted that it was adopting the test articulated in *Bartholomew v. Insurance Co. of North America,* 502 F.Supp. 246, 254 (D.R.I.), *aff'd,* 655 F.2d 27 (1st Cir. 1981) (date of occurrence is the date the plaintiffs knew, or reasonably should have

---

**18.** In this action, we simply reverse the summary judgment granted in favor of American Home. We do not conclude that all of Hancock's claims will necessarily be proven to be consequential damages of the breakage of LOF's windows. That is an issue to be decided at trial, rather than on review of this summary judgment motion.

known, that the machine bought was "fundamentally flawed such that it is incapable of fulfilling its intended purpose") and in *United States Fidelity & Guaranty Co. v. American Insurance Co.,* 169 Ind.App. 1, 345 N.E.2d 267, 271–72 (1976) (damage occurs when the harm puts a reasonable person on notice of a possibly defective structure.)

■ We agree that the test for determining the date of the occurrence should be the time at which a reasonable person would be aware that a defect exists that may give rise to a cause of action. In this case, Hancock became aware of the windows' defects in January 1973, when Pei informed Hancock that the windows presented "a clear and present danger" to the public. Thus, the occurrence took place within the time period covered by the American Home policy, that of June 1972 to April 1973.

## III. APPORTIONMENT FORMULA

The district court found that the only claim against LOF covered by its policy with American Home was the $25.9 million for loss of use of the Hancock Building. The court then concluded that it needed to determine how much of the $26 million settlement amount paid by LOF was attributable to that covered loss of use claim. In doing so, the court used an apportionment formula that led to the conclusion that LOF had already been overly compensated for its only covered claim of loss of use.

The district court first noted that there was no evidence in the record before it to establish how the $26 million that LOF contributed to the Hancock settlement had been apportioned among the various Hancock claims. The district court concluded that it "must assume accordingly that the amount attributable to the covered loss of use is the proportion represented by the percentage of the total claim represented by loss of use." Thus, the $25.9 million loss of use claim, representing 29% of Hancock's total claim of $89 million, was deemed to represent only 29% of LOF's $26 million settlement contribution, or $7,507,-913. The district court then considered the amount already paid to LOF by its primary insurer, Commercial Union. Because Commercial Union's policy was identical to that of American Home, the court concluded that Commercial Union also would have been legally liable only for the loss of use claim. The court therefore attributed Commercial Union's entire payment of $7,643,-272 to the loss of use claim, and then subtracted that amount from the $7,507,-913 deemed to have been paid by LOF for the loss of use claim. Because Commercial Union's payment was actually $135,359 above that amount, the court found that there was no excess or umbrella liability to be covered by American Home.

The district court cited no specific precedent for its apportionment approach, but rather appeared to assume that its approach was the one that made the most sense. In addition, the district court refused to accept any affidavits from LOF regarding if and how any apportionment had been made in the settlement decision. The court stated that any noncontemporary allocation would inevitably be tainted by a witness's desire to attribute most of the settlement money to the loss of use claim.

Although we conclude that American Home is liable for all consequential damages arising from damage to LOF's windows, and not just for loss of use, the allocation issue may conceivably arise once again if LOF fails to prove at trial that Hancock's claims were indeed for such covered consequential damages. *See supra* n. 18. We therefore put forth our view on the allocation to be applied.

We agree with the district court that some form of allocation is appropriate. *See e.g., Employers Mutual Liability Insurance Co. of Wisconsin v. Hendrix,* 199 F.2d 53, 57–59 (insurer not liable for all damages paid in settlement of a claim where some causes of action were beyond the scope of the policy); *Bundy Tubing Co. v. Royal Indemnity Co.,* 298 F.2d 151, 154 (6th Cir. 1962) (on remand, district court must determine whether items of damage included in a settlement were all covered damages to property under the policy as interpreted by appellate court). Even in *American Motorists Ins. Co. v. Trane Co.,* 544 F.Supp. 669, 690–91 (E.D. Wisc.1982), *aff'd* 718 F.2d 842 (7th Cir. 1983), a case relied on extensively by LOF, the court pointed out that "[t]here may be cases where a trial court must attempt to make a precise finding regarding the pro-

priety of the portion of a settlement represented by the insurer's policy limits".[19]

We do not believe, however, that it was appropriate to make this allocation without accepting any evidence from the parties. It may not be correct to assume that LOF considered the $26 million to be allocated equally to each of the Hancock claims. As LOF pointed out during the summary judgment hearing, it may have felt that the loss of use claim was one that could be more easily proven at trial, given the availability and exactness of figures for lost rents, than could, for example, the $50 million claim for increased operating costs. Thus, despite the problems that are inherent in any post facto analysis of settlement claims, if the district court is to make an allocation of the settlement amount, it should accept whatever evidence is available regarding the intent behind the settlement decision. If the court finds that there is a material issue of fact as to how the settlement amount was allocated, that finding should be made at trial and not on summary judgment.

Whatever apportionment figure the district court arrives at for the covered claims, that apportionment figure should be equally applied to the $7,643,272 paid by Commercial Union. It is true that Commercial Union, had it litigated its coverage, would have been responsible only for those Hancock claims found to be consequential losses from the breakage of the LOF windows. Nevertheless, although Commercial Union originally informed LOF that its policy might not cover the claims against LOF, Commercial Union did not choose to litigate its coverage. Rather, it undertook LOF's defense of the Hancock claims, participated in the settlement negotiations, and then entered into negotiations with LOF to determine the amount the insurance company would pay. As John Schreiber, the branch manager of Commercial Union explained, LOF had four policy years of coverage with Commercial Union, an aggregate of $37 million of coverage, and various lawsuits at issue. In the final agreement, Commercial Union and LOF agreed that the date of the occurrence for the Hancock claims would be set as of June 1, 1972— within the 1972-73 policy year—and that Commercial Union would pay the balance remaining from the $10 million coverage available for that policy year. Regarding the applicability of the various policy exclusions, Schreiber explained that "[w]e ultimately reached a decision so that we had no policy exclusions to be concerned with when we reached the agreement."

It is clear, therefore, that Commercial Union did not assume that its payment was to cover only a selected number of Hancock's claims. Rather, because it chose to settle rather than litigate its policy coverage, Commercial Union had no particular interest in how the $26 million contributed by LOF was allocated among the various Hancock claims nor how its payment was to be allocated in turn. It would be inequitable now to consider Commercial Union's payment to apply solely to a selected number of Hancock's covered claims. If LOF's contribution of $26 million is ultimately apportioned in some fashion among the eight Hancock claims, Commercial Union's payment should be apportioned in the same fashion.

**19.** The actual holding in *American Motorists Ins. Co. v. Trane Co.*, 544 F.Supp. 669, 690–91 (E.D. Wisc.1982), *aff'd* 718 F.2d 842 (7th Cir.1983), is also not to the contrary. The court there refused to allocate any of the settlement amount made by the insured, where the insured sought to collect money from its *primary* insurer. The court held that the insurer's policy covered only one claim out of four that had been negotiated at settlement, but concluded that the primary insurer's liability cap of $50,000 for that covered claim was "presumably a relatively small proportion of the total settlement." 544 F.Supp. at 690. The court did not state what the overall settlement amount had been, but the injured party had claimed $1 million in damages for the covered claim. *Trane*, 544 F.Supp. at 676. The court apparently assumed that at least $50,000 of the settlement amount could be attributable to the damages for the covered claim, and thus refused to reduce or prorate that amount. *Id.* at 689–90. By contrast, in our case, American Home's liability coverage of $10 million is a much more significant percentage of the $26 million settlement amount paid by LOF.