Harry JOHNSON, et al., Plaintiffs,

v.

Robert J. STUDYVIN, Defendant,

Great American Insurance Company, et al., Garnishees.

GREAT AMERICAN INSURANCE COMPANY, et al., Plaintiffs,

v.

Robert J. STUDYVIN d/b/a Studyvin Drywall, et al., Defendants.

Nos. 92–2292–JWL, 92–2430–JWL.

United States District Court, D. Kansas.

Dec. 17, 1993.

Daniel G. Menzie, Turner & Boisseau, Chartered, Wichita, KS, Victor A. Bergman, John M. Parisi, Shamberg, Johnson, Bergman & Morris, Chtd., Overland Park, KS, for Harry Johnson, Annie K. Johnson, Erin C. Johnson, Bridget B. Johnson, and Deborah A. Sapp–Johnson.

Curtis L. Tideman, Lathrop & Norquist, Overland Park, KS, Kyle B. Mansfield, Stephen J. Foley, Foley & Mansfield, Minneapolis, MN, for Great American Ins. Co., and American Nat. Fire Ins. Co.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

The plaintiffs, Harry Johnson, Deborah A. Sapp–Johnson and their children, bring this action against Great American Insurance Company ("Great American") to recover for damages arising from the installation of asbestos containing material in areas of their home by Robert J. Studyvin ("Studyvin") and his company Studyvin Drywall. A trial to the court was held on this matter beginning November 2, 1993. After careful consideration, the court finds, by a preponderance of the evidence, that plaintiffs are not entitled to recover damages for their injuries under the terms of the insurance agreement be-

tween Great American and Mr. Studyvin, and that Great American did not breach any duty to defend. Thus, the court finds in favor of Great American Insurance Co., and denies plaintiffs' requested relief on all grounds.

Pursuant to Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact and conclusions of law.

## I. Findings of Fact

1. Robert J. Studyvin is a drywall subcontractor who in August and September of 1977 applied asbestos containing materials ("ACM") to the ceiling of a home purchased by the Johnsons in 1985. In 1990, the roof of the house was damaged and in the course of repairing the home, the ceiling was removed and the ACM was released into the air, contaminating the entire Johnson home.

2. In 1977, Studyvin was insured by Great American Insurance Company under a Select Liability Policy ("SLP"), which covered certain types of personal injury and property damage. Mr. Studyvin actually had SLPs providing coverage from 1976 to 1982. These policies obligated Great American to defend a suit against the insured seeking damages on account of bodily injury or property damage even if the allegations of the suit were "groundless, false or fraudulent."

3. In 1991, the Johnsons brought suit against Studyvin, seeking redress for both personal injury and property damage as a result of the contamination of their home. In April of 1991, Mr. Studyvin notified Great American, through Great American's sales agent Lockton Insurance Company, of the claim against him and requested a defense in the action.

4. In May of 1991, Great American had a copy of the Petition containing the Johnson's allegations against Mr. Studyvin. Lisa Newbold, the manager for Environmental Claims for Great American, was responsible for the handling of Mr. Studyvin's claim for insurance beginning around this time. It was her responsibility to determine whether to provide Mr. Studyvin with a defense against the Johnson's claim.

5. On June 5, 1991, David Fieser, an adjuster with Leamon, Peterson & Bello, met with Mr. Studyvin on behalf of Great American regarding the Johnson's claims against him and potential coverage by Great American. At this time, Mr. Studyvin explained the circumstances surrounding the installation of the ACM in the Johnson home, and signed a "Non-Waiver Agreement" drawn by Great American. The agreement provided that Mr. Studyvin "may" hold a Great American policy and that he claims benefits under the policy for events occurring in 1977. The agreement continues to provide as follows:

And whereas it appears that the interest of both the Assured and the Company may be better served and protected by an investigation of the facts and/or entering of defense on behalf of the Assured:

Now, therefore, it is understood and agreed between the Assured and the Company that the Company may by its representatives proceed to investigate the said accident, or undertake the defense of any suit growing out of the said accident, without prejudice to the rights of the said company, and that no action heretofore or hereafter taken by the Company shall be construed as a waiver of the right of the Company, if in fact it has such right, to deny liability and withdraw from the case; also, that by the execution of this agreement the Assured does not waive any rights under the policy.

6. In a letter dated June 6, 1991, Lisa Newbold advised Mr. Studyvin that Great American could not locate an insurance policy for him covering the period of time in which the ACM was installed in the Johnson home. She also advised him that even if proof of such a policy were found, it was unlikely he was covered for the damage caused by the ACM. She based her conclusions on the provisions of the standard SLP used by Great American in 1977. Other portions of the letter are as follows:

Until such time as we are able to verify the existence of the policy, we will be unable to make a commitment to you with respect to indemnity of defense of this lawsuit.

... A review of the coverage form which was typically issued in 1977, reveals the following exclusions which may be applicable to this lawsuit ...

... As our investigation continues, there may be other coverage issues presented as well. Great American Insurance, therefore, reserves its right to disclaim coverage under the policy provisions cited, as well as other potentially applicable policy provision [sic]. By our undertaking the investigation of this claim, we do not waive any rights under the applicable policy. .

7. Subsequently, Ms. Newbold was able to verify that Mr. Studyvin was insured by Great American under SLP policies from December 5, 1978 through December 5, 1981. However, Mr. Studyvin's actual 1977 policy was not and could not be located in Great American's files. Great American did have access, however, to the basic SLP form, 21000C, and all of the basic forms used as endorsements to the SLPs. Great American also had a computer program ("MIFMAP" program) through which it could verify the existence of a policy. Once Great American had a policy number, it could run a "MIF-MAP" and a printout containing limited information about the policy could be generated. The original purpose of the MIFMAPs was to track and maintain statistical data for the company. Although MIFMAPs and standard forms available to Great American could establish pieces of the policy issued to Mr. Studyvin, an exact replica of the policy could not be recreated.

8. Complete copies of all of the Great American Insurance policies issued to Mr. Studyvin existed in files maintained by the Lockton Insurance Agency, however, these files were lost for a period of time and could not be located even after great efforts on the part of Lockton. The files were eventually located during discovery of this case, well after a default judgment had been issued against Mr. Studyvin as to the Johnson's claims against him.

9. Months passed and Great American did not locate a policy for Mr. Studyvin for the year of 1977. Mr. Studyvin was also unable to locate a copy of the policy throughout this time. After the investigation by the private adjuster and a few "MIFMAP" searches, Ms. Newbold and Great American took no further action in pursuit of discovery of coverage of the claims against Mr. Study-vin. Ms. Newbold made no effort to contact Mr. Studyvin by phone or in person, nor was there any significant correspondence by letter between Ms. Newbold and Mr. Studyvin for a period of months.

10. On January 19, 1992, Mr. Studyvin wrote to Great American and advised it that a trial date of February 3, 1992 had been set to determine the validity of the Johnson's claims against him. Great American responded on January 29, 1992, four days before trial, and informed him it did not have sufficient information to determine whether or not it could act in his defense.

11. On February 6, 1992, Richard C. Wallace of Evans and Mullinix, P.A., informed Great American via facsimile that a default judgment would be entered against Mr. Studyvin on Monday, February 10, 1992, in the Johnson County District Court in Olathe, Kansas. Mr. Wallace represented Mr. Studyvin in a separate bankruptcy action, which was proceeding at the same time as the Johnson's action, but did not represent him in the matter involving the Johnsons and Great American. Mr. Wallace did, however, periodically advise Mr. Studyvin in general terms how he might proceed regarding the Johnson's claims.

12. Despite this notice, Great American did not represent Mr. Studyvin; Mr. Studyvin in fact had no representation in the action and a default judgment was entered against him in favor of the Johnsons on February 11, 1992. Ms. Newbold was not in the office at the time the notice was received and did not learn of the default hearing until after the default judgment had been entered.

13. The judgment was entered in the amount of $1,309,200.00. It listed the Johnson's property damage as totaling $184,200.00 and was broken down further as follows:

Cost to abate or clean up asbestos in home—$45,000.00

Cost to refurbish the dwelling after abatement to a liveable condition—$27,000.00

Diminution in value of the plaintiff's home after clean up—$21,400.00

Loss of all personal property in the home due to asbestos contamination—$67,800.00

Cost of additional living expenses of the Johnsons—$23000.00

The order listed the remaining damages to be noneconomic damages of $375,000.00 and personal injury damages of $750,000.00.

14. Great American did not seek relief from the default judgment in any court.

15. Based on advice from Richard Wallace, Mr. Studyvin understood that if the Johnsons were successful in obtaining a judgment against him, that judgment might set the total amount of unsecured claims against him above $100,000, rendering him ineligible for Chapter 13 bankruptcy. Due in part to a desire to remain eligible to maintain his bankruptcy action, Mr. Studyvin entered into an agreement with the Johnsons in which he assigned all rights to liability coverage or indemnification under the Great American policy to the Johnsons. In return, the Johnsons agreed not to pursue their claims against Mr. Studyvin in the bankruptcy court and to collect their damage award solely through an insurance carrier which might be liable to pay the judgment. Mr. Studyvin was absolved of any personal liability on the judgment.

16. Great American subsequently filed a complaint for declaratory judgment in this court. At the time, it had yet to locate a copy of Mr. Studyvin's policy for 1977. About four days after the mailing of the complaint to the clerk's office, Great American ran a MIFMAP search that confirmed that Mr. Studyvin was insured in 1977. The same search had previously been run, yet yielded the opposite result, indicating that no policy could be confirmed for Mr. Studyvin for 1977. The specific terms of Mr. Studyvin's SLP for 1977 have now been established through records of the Lockton Insurance Agency and the records of Mr. Studyvin.

17. Mr. Studyvin's SLP policy for 1977 provided for the following:

[Great American] agrees with insured, named in the declarations made a part hereof, in consideration of the payment of the premium and subject to limits of liability, exclusions, conditions and other terms of this policy:

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury caused by an occurrence.

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage caused by an occurrence.

(b) Bodily injury means bodily injury, sickness, or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

(g) Occurrence means an accident, including continuous or repeated exposure to conditions, which results during the policy period in bodily injury or property damage neither expected nor intended from the standpoint of the insured. For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

(h) Property damage means (1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at anytime resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

This policy does not apply:

(f) under Coverage D [property damage liability], ... (3) with respect to the completed operations hazard, to property damage to work performed by the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(n) under Coverages B and D, to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market

or from use because of any known or suggested defect or deficiency therein;

(o) under any liability coverage to bodily injury or property damage arising out of the discharge, disbursal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply (a) if such discharge, disbursal, release or escape is sudden and accidental....

(y) to property damage ... (2) except with respect to liability under a written sidetrack agreement or the use of elevators to ...

(d) that particular part of any property, not on premises owned by or rented to the insured, (i) upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out of such operations ...

(z) with respect to the completed operations hazard and with respect to any classification stated below as "including completed operations", to property damage to work performed by the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

18. No demand was ever made upon Great American to settle within the policy limits at any time prior to the default judgment or subsequent thereto.

19. The court finds that the amount of damages suffered by the Johnsons for the loss of use of their home due to the work by Mr. Studyvin to be in the amount of $23,000.

20. The court finds, however, that these losses are not covered under the insurance contract between Mr. Studyvin and Great American and that Great American is not liable for these losses.

21. The court finds that Great American did not breach a duty to defend Mr. Studyvin.

## II. Conclusions of Law

### A. Duty to Defend

Under Kansas law, the general rule is that an insurer has a duty to defend an insured whenever there is a possibility of coverage, even when that possibility is remote.[1] *Catholic Diocese of Dodge City v. Raymer*, 16 Kan.App.2d 488, 494, 825 P.2d 1144, 1149, *aff'd*, 251 Kan. 689, 840 P.2d 456 (1992). The possibility of coverage must be determined by a good-faith analysis of all information known to the insured or all information reasonably ascertainable by inquiry and investigation. *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 686, 512 P.2d 403, 407 (1973).

Great American argues that the duty to defend was never triggered in this case because Mr. Studyvin had the burden to prove the existence of a 1977 policy before the default judgment was entered and failed to meet this burden. Kansas law, however, is to the contrary. When the possibility of coverage depends first on whether the named defendant is an insured, as opposed to whether the policy itself provides coverage, Kansas courts apply an ultimate showing or retrospective test to determine whether an insurer breached a duty to defend. *Murphy v. Silver Creek Oil & Gas, Inc.*, 17 Kan. App.2d 213, 837 P.2d 1319, 1322 (1992); *Williams v. Community Drive–In Theatre, Inc.*, 3 Kan.App.2d 352, 595 P.2d 724, 726 (1979).

Under the facts of this case, Mr. Studyvin was unable, for a period of time, to find proof he had a Great American policy in 1977. It is now undisputed, however, that Mr. Studyvin did in fact have a Great American policy insuring him in 1977. Contrary to Great American's position, the duty to defend applies, for Mr. Studyvin was ultimately insured by a 1977 SLP. *Murphy*, 17 Kan. App.2d 213, 837 P.2d at 1322.

The court finds, however, that Great American did not breach this duty. As is set forth fully below, the court finds that the

1. As this is a diversity action, the court must ascertain and apply Kansas law with the objective to reach the same conclusions a Kansas court would reach. *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 641 (10th Cir.1991).

1977 policy did not afford coverage to Mr. Studyvin for the damage caused to the Johnson's property. The determination of whether there is a duty to defend ultimately depends upon whether coverage exists under an insurance policy. *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 709–10, 732 P.2d 741 (1987); *Casualty Reciprocal Exchange v. Thomas*, 7 Kan.App.2d 718, 647 P.2d 1361 (1982) (insurer has no duty to defend if there is no coverage). Because the court finds there was in fact no coverage, it is clear that Great American did not breach any duty to defend Mr. Studyvin in the underlying suit brought by the Johnsons. *See also Catholic Diocese of Dodge City*, 16 Kan. App.2d at 488, 825 P.2d at 1149.

### B. Potential Liability & Measure of Damages

■ As set out in its order dated July 28, 1993, this court has found that the property of the Johnsons was physically injured when Mr. Studyvin applied a ceiling texture and incorporated ACM into the ceiling of their home. *See Johnson v. Studyvin*, 828 F.Supp. 877, 882–4 (D.Kan.1993). It further held that the installation of the asbestos in 1977 damaged the Johnson's property and any loss of use of the property resulting from that original damage was potentially covered under the policy. The court's reasoning will not be repeated here.[2]

The Johnsons have already obtained a default judgment in which the issuing court determined the measure of all damages suffered as a result of the asbestos installation. The total amount of property damage was held to be $184,200. This court is bound by the previous order, and is concerned here solely with the issue of which property damages are attributable to "loss of use" as the term is used in the insurance contract between Mr. Studyvin and Great American.

Plaintiffs argue that the term "loss of use" includes all property damage and the costs to plaintiffs arising therefrom. In essence, plaintiffs argue that Great American is potentially liable for all consequential damages arising out of the injury to their home; including the cost of abatement, the cost to refurbish the home, lost market value of the home after clean up, and loss of peace of mind and enjoyment. The court simply can not attribute such a broad reading to the term "loss of use" of property. *See American Home Assurance Co., v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 29 (1st Cir.1986) (distinguishing between consequential damages arising from property damage and the more restrictive term "loss of use").

In an action for damages based on an insurance agreement, the provisions of the contract govern the measure of recovery. *See Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 519 P.2d 667, 671–2 (1974). The state court default order determined that the Johnsons were entitled to $23,000 for additional living expenses while repairs were made on their home. The court finds that these additional expenses are covered in the agreement as they are directly attributable to the Johnson's loss of use of their home. *See Weathers v. American Family Mut. Ins. Co.*, 793 F.Supp. 1002, 1013 (D.Kan.1992) (additional living expenses attributable to loss of use). The court declines to find, however, that damages awarded for "private nuisance" in the amount of $375,000 are covered under the SLP policy. Plaintiff can point to no case in which the term "loss of use" of property has been extended to compensate for personal hardship, annoyance, inconvenience and loss of peace of mind. The policy itself limits the damages to property only and not personal injury, and even the broadest reading of "property damage" cannot be construed to include personal annoyance or mental anguish. Thus, the potential liability of

---

**2.** Great American argues that the court's reasoning in its previous memorandum was flawed because according to Kansas law there was no occurrence within the policy period for which the plaintiffs can assert coverage, and cites *Scott v. Keever*, 212 Kan. 719, 512 P.2d 346 (1974) and *Ruthrauff v. Kensinger*, 214 Kan. 185, 519 P.2d 661, 666–67 (1974) in support of its position. As

the court has previously stated, Kansas has not addressed the issue of when property damage occurs when a policy defines property damage as "physical injury to or destruction of tangible property which occurs during the policy period including the *loss of use thereof at anytime resulting therefrom.*" The cases cited by Great American are not to the contrary.

Great American does not exceed $23,000 for loss of use.

## C. Insurance Coverage

### 1. Estoppel to Deny Coverage

■ Plaintiffs contend that Great American waived the right to assert the application of exclusions when it breached its duty to defend. Because the court finds there was no breach here, plaintiffs' argument fails. Moreover, to the extent plaintiffs argue that a breach of the duty to defend automatically precludes an insurer from asserting the application of particular exclusions of a policy, they are incorrect. Under Kansas law, an insurer is not estopped from raising a defense based on exclusions within the policy solely because it breached a duty to defend. See Murphy, 17 Kan.App.2d 213, 837 P.2d at 1321; Johnson v. Studyvin, 828 F.Supp. 877 (D.Kan.1993).

■ Plaintiffs also contend that Great American waived its right to assert the application of the exclusions because it did not clearly notify Mr. Studyvin that it was preserving the right to contest liability early on in its limited investigation of the Johnson's claims. Plaintiffs rely on the proposition that where an insurance company under a liability policy takes charge of the defense of an insured which may then be imposed to an action on which liability rests, it is estopped from later asserting that the claim is beyond the scope of the coverage afforded unless it gives proper notice of its right to set up the defense. Bogle v. Conway, 199 Kan. 707, 711, 433 P.2d 407, 411 (1967). Although this is an accurate reflection of the general rule, it does not help plaintiffs here. For one, Great American never assumed the defense of Mr. Studyvin. Moreover, Great American clearly informed Mr. Studyvin that in the event it did undertake his defense of the Johnson's claim, it would not relinquish the right to deny coverage at a later date.

The non-waiver agreement signed by Mr. Studyvin states that "it is understood and agreed" that the Company may undertake the defense of Mr. Studyvin, but that "no action ... taken by the Company shall be construed as a waiver of the right of the Company, if in fact it has such a right, to deny liability...." This agreement and reservation of rights was clear and unambiguous. In addition, Ms. Newbold, in her letter of June 6, 1991, specifically mentioned that if a policy were located for 1977 that certain exclusionary clauses might apply to preclude coverage. Many potentially applicable exclusions were stated in full, including the work-product exclusions and the pollution exclusion upon which Great American now bases its defense. Mr. Studyvin was aware, as early as June 6, 1991 that Great American was reserving the right to deny coverage at a later date and was even aware of the particular exclusions which could potentially preclude coverage. Great American is not estopped from asserting the applicability of the exclusions.

### 2. "Work Product" Exclusions

■ Great American argues that a variety of exclusions, generally termed work product exclusions, apply to bar coverage in this case. For the reasons set forth below, the court finds, that exclusion (y)(2)(d)(i) applies to the circumstances of this case. As a result, coverage for the Johnson's claims is precluded and their request for damages for loss of use of their home is denied.

■ If an insurer intends to restrict or limit coverage provided in a policy, it must use clear and unambiguous language in doing so. Farm Bureau Mut. Ins. Co. v. Old Hickory Casualty Ins. Co., 248 Kan. 657, 660, 810 P.2d 283, 286 (1991). If the language of the policy is capable of two meanings, it must be construed in favor of the insured. Id. It is the insurer's burden to prove that an exclusion applies to a particular set of circumstances. Upland Mut. Ins. Co. v. Noel, 214 Kan. 145, 150, 519 P.2d 737, 742 (1974). The overall function and goal of the court is to give effect to the intent of the parties and to enforce the contract as made. Farm Bureau Mut. Ins. Co., 248 Kan. at 660, 810 P.2d at 286.

Great American argues that exclusion (z) of the Broad Form Property Damage Endorsement applies. However, the court finds otherwise. The exclusion states that there is no coverage for property damage to "work

performed by the named insured." In this case the damage has been to the Johnson's property, not to the work performed by Mr. Studyvin. See *Maryland Cas. Co. v. W.R. Grace & Co.*, 794 F.Supp. 1206, 1227 (S.D.N.Y.1991), (exclusion does not apply where products are alleged to have caused damage to property owned by others, but would apply if underlying claim alleged that the insured supplied defective or faulty asbestos). Exclusion (z) is not ambiguous, and clearly does not apply to bar coverage here.[3] *Uhock v. Sleitweiler*, 13 Kan.App.2d 621, 628–29, 778 P.2d 359, 364 (1988) (citing *Owings v. Gifford*, 237 Kan. 89, 92–3, 697 P.2d 865 (1985)).

The court also finds that exclusion (n) does not apply, in part for the same reason (y) and (z) do not apply, that being that the exclusion covers damage to the work and work product of the insured. Exclusions similar to exclusion (n) here, commonly known as "sistership" exclusions, have been examined by other courts which have held they are not applicable to the situation in which the installation of ACM damages property. In *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, the Illinois Supreme Court analyzed such a clause and concluded the following:

> The "sistership" exclusion excludes coverage in cases where, because of the actual failure of the insured's product, similar products are withdrawn from use to prevent the failure of these other products, which have not yet failed but are suspected of containing the same defect. The exclusion applies only to the costs associated with the withdrawal and repair or replacement of "sister" products which have not yet failed. It does not apply, however, to the product that has already failed while in

use and caused damage to the property of a third party.

144 Ill.2d 64, 161 Ill.Dec. 280, 288, 578 N.E.2d 926, 934 (1991) (citing *Honeycomb Systems, Inc. v. Admiral Ins. Co.*, 567 F.Supp. 1400, 1406 (D.C.Me.1983); *Charles E. Brohawn & Bros., Inc. v. Employers Commercial Union Ins. Co.*, 409 A.2d 1055, 1057–58 (Del.1979)). The court further reasoned that the underlying complaints allege the ACM failed while in use, resulting in damage to property of the building owners, seeking damages not for the cost of withdrawing sister products from the market, but as a measure of the property damage already incurred. As a result, the "sistership" exclusion was held inapplicable. In accord *American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 29 (1st Cir.1986); *Stonewall Insurance Co. v. Nat'l Insurance Co.*, 1992 WL 123144 *18, 19 (S.D.N.Y. May 27, 1992); *Maryland Cas. Co.*, 794 F.Supp. at 1227 (S.D.N.Y.1991). The court is persuaded by the rationale of these cases that exclusion (n) does not apply here. Plaintiff has failed to persuade the court that there exists more than one reasonable interpretation of this provision.[4]

The court finds, however that exclusion (y) of the Broad Form Property Damage Endorsement does exclude coverage of the Johnson's claims. Exclusion (y) states that there is no coverage for property damage "to (d) that particular part of any property, not on premises owned by or rented to the insured, (i) upon which operations are being performed by ... the insured at the time of the property damage arising out of such operations." This exclusion is much broader than those examined above, and on its face excludes coverage for the type of property damage suffered by the Johnsons. By applying the ACM to the ceiling of the Johnson

---

**3.** Great American argues that *Owings v. Gifford*, 237 Kan. 89, 697 P.2d 865 (1985), requires that the court find exclusion (z) applicable. In *Owings* an insured builder could not recover where there was a similar work product exclusion in the applicable policy. The court determined that the house constructed by the builder was his work product and therefore damages due to faulty construction of the house were damages to his work product and, thus, not covered. *Owings*, 237 Kan. at 94–95, 697 P.2d at 869–70. In this case, Mr. Studyvin's work product caused

the damage to the Johnson's property; Mr. Studyvin's work product remained totally in tact and was not in and of itself faulty.

**4.** Although not argued by Great American in its trial brief or at trial, for the purpose of completeness, the court finds and concludes that exclusions (h) and (i) do not apply to bar coverage in this case because both provisions apply only to damage to the insured's work product.

home, Mr. Studyvin damaged property, upon which operations were being performed by him, at the time of such operations. Contrary to plaintiff's position, the exclusion does not state it applies only to property damage to the work product of Mr. Studyvin.

■ It does not follow, as plaintiffs argue, that simply because this provision appears near other general work product exclusions within the contract, that it, like the other exclusions, applies only to damage to the work product of Mr. Studyvin. The court finds that exclusion (y)(2)(d)(i) is not ambiguous, and that plaintiffs are bound by the clear language of the policy. An insurance company is not liable under an insurance contract if the terms of that contract clearly exclude it from coverage. *Topeka Ry. Equip., Inc. v. Foremost Ins. Co.*, 5 Kan.App.2d 183, 187, 614 P.2d 461, 464 (1980).

### III. Conclusion

For the reasons set forth above, the court finds that Great American did not insure Mr. Studyvin for the damages caused by his installation of asbestos containing material in the Johnson home. Accordingly, the court finds Great American is not liable on any of the Johnson's claims for relief.

**IT IS THEREFORE ORDERED BY THE COURT** that judgment is rendered in favor of Great American Insurance Co. on all claims.

**IT IS SO ORDERED.**