724 F.Supp. 474 (1989)
The DOW CHEMICAL COMPANY, Plaintiff,
v.
ASSOCIATED INDEMNITY CORPORATION; the American Insurance Company; Aetna Casualty & Surety Company; American Home Assurance Company; California Union Insurance Company; Central National Insurance Company of Omaha; the Home Insurance Company; International Surplus Lines Insurance Company; Midland Insurance Company; Underwriters at Lloyd's London; and Insurance Companies Subscribing Policies CU 10086, CU 10087, CU 10088, K 25298, and UGL 0519, Defendants.
No. 85-CV-10037-BC.
United States District Court, E.D. Michigan, N.D.
September 7, 1989.
*475 Joseph L. Falik, Eric H. Lipsitt, Greg Smith, Wise & Marsac, Detroit, Mich., Philip S. Beck, Samuel A. Haubold, Michael P. Foradas, Kirkland & Ellis, Chicago, Ill., Samuel P. Jordan, R.W. Barker, Legal Dept., The Dow Chemical Co., Midland, Mich., for Dow.
*476 Andrew Butz, Gary M. Elden, Charles S. Bergen, Irving C. Faber, Grippo & Elden, Chicago, Ill., Glenn F. Doyle, Carl H. Smith, Smith & Brooker, Bay City, Mich., for Assoc. Indem. & American Ins.
William M. Cohn, William T. Cahill, Matthew Gehringer, Phelan, Pope & John, Chicago, Ill., Floyd Wetmore, Francis, Wetmore & Groom, Midland, Mich., for Aetna Cas.
John B. Haarlow, Lord, Bissell & Brook, Chicago, Ill., George M. Tunison, Purcell, Tunison & Cline, Saginaw, Mich., for Cent. Nat. & Lloyd's.
Randall Phillips, Proviser, Lichtenstein, Pearlman & Phillips, Southfield, Mich., for American Home.
James N. Martin, Victor Van Camp, Martin, Bacon & Martin, Mt. Clemens, Mich., for California Union.
Michael E. Thoits, Michael G. Costello, Plunkett & Cooney, Detroit, Mich., for Home Ins.
Timothy McVey, Sandra Young, Purcell & Wardrope, Chicago, Ill., Andrew B. Wachler, Mark S. Kopson, Andrew P. Wachler, P.C., Detroit, Mich., for Intern. Surplus.
Robert A. Alkema, Chairman, Michigan Property & Cas. Guarantee Ass'n, Livonia, Mich., Andrew A. Alberti, Acting Sp. Deputy Superintendent of Ins., New York City, for Midland Ins.

MEMORANDUM OPINION
CHURCHILL, Chief Judge.

I. Introduction
This is a declaratory judgment action commenced by The Dow Chemical Company ("Dow") against various insurers. Dow, a large producer of chemicals and related products, is a Delaware corporation with its principal place of business in Midland, Michigan. There are numerous defendants; an outline of all defendants is attached to this opinion as Addendum A. Each defendant is diverse to Dow. Cf. 28 U.S.C. § 1332(a). The Fireman's Fund Companies (collectively "Fireman's Fund") served as Dow's primary general liability insurer from 1956 to April 15, 1976. The other defendants (collectively "the excess carriers") are insurers that provided excess general liability insurance to Dow during portions of the same time periods. Certain of the excess carriers have indirect interests in the outcome of this suit in their capacities as reinsurers. See generally Colonial American Life Ins. Co. v. Commissioner of Internal Revenue, 491 U.S. ___, ___, 109 S.Ct. 2408, 2411, 105 L.Ed.2d 199, 207 (1989) (explaining the concept and varieties of reinsurance). This duality does not affect the rights to be declared in this lawsuit, but it may have colored some of the excess carriers' positions on some subissues.
This suit involves coverage issues with respect to a series of product-related property damage claims referred to as Sarabond claims.[1] The case under consideration is but one of five suits between Dow, Fireman's Fund, and others involving Dow's general liability insurance program.[2]

A. The Nature of Sarabond
During the early 1960's, Dow developed a product called Sarabond, which is a mortar additive. The product was based upon saron latex, the same material used in the well-known product called Saran Wrap. Sarabond was intended to act as a "super glue" for mortar that Dow hoped would be attractive to the construction industry. For example, Sarabond was intended to *477 facilitate the construction of prefabricated brick wall panels. Beginning in the mid-1960's, Dow marketed Sarabond with the reasonable expectation of substantial sales and profit. Dow's marketing effort met with some success; Sarabond was used in upwards of 1,000 major structures before Dow discontinued sales of the product in 1976.
It is a common thread in all underlying complaints that Sarabond leads to rust, that rust accumulates, that rust occupies more space than the steel it replaces, and that this expansion causes cracking which eventually is manifested. In more than ten percent of the structures that contain Sarabond, property damage has manifested itself, sometimes several years after the completion of construction. This has resulted in a large number of lawsuits and claims against Dow and others. Three suits have gone to trial,[3] several have been settled, and others are pending.

B. The Issues Raised by the Pleadings and Motions
In its second amended complaint filed October 31, 1986, Dow seeks a declaration of rights with respect to two aspects of coverage: (1) the duty to defend; and (2) the duty to indemnify. Cf. Allstate Ins. Co. v. Maloney, 174 Mich.App. 263, 268, 435 N.W.2d 448 (1988) ("An insurer's duty to defend a lawsuit brought against its insured is separate and severable from its duty to indemnify the insured for liability imposed after trial."). Pursuant to a letter agreement dated November 21, 1980, Fireman's Fund has been reimbursing Dow for substantial costs expended by Dow in defending Sarabond suits. Issues involving the duty and cost of defense presently are dormant. The excess carriers have no interest in the dispute over defense costs. All defendants, however, are potentially interested in the indemnity controversy.
The indemnity dispute has many facets including: (1) a trigger of coverage issue; (2) a number of occurrences issue; (3) a punitive damage issue; and (4) issues concerning the impact of the "intended damages" clauses of the primary and excess coverage policies. Extensive discovery addressing these issues has already occurred,[4] but some discovery has been postponed pending resolution of several motions currently under advisement. The Court now has under advisement motions and cross-motions for summary judgment and partial summary judgment. These motions provide the Court with the opportunity to narrow the issues and identify the outcome-determinative questions on which genuine issues of material fact remain. It is entirely possible that another series of dispositive motions will be necessary before trial in light of the Court's rulings on pending motions. To enable the parties to proceed with discovery, the Court has chosen to first decide the motion addressing the trigger of coverage issue. This opinion focuses on that matter. All pending motions regarding the remaining issues will be decided in due course.

C. Defining the "Trigger of Coverage" Dispute
The trigger of coverage issue encompasses two distinct subissues, and the importance of distinguishing between them cannot be overemphasized. Unfortunately, this perspective was not shared by counsel; this circumstance has compounded the difficulty in sorting out and understanding the arguments in the parties' briefs. The first subissue involves determination of the trigger of coverage applicable to this type of property damage claim under the insurance contracts and Michigan law. The second *478 subissue concerns the identification and definition of the remaining genuine issues of material fact upon which Dow's right (if any) to be indemnified depends in light of the Court's ruling on the first subissue.
The etiology of a Sarabond claim is unique in that there may be several stages of undesirable physical change within the walls of a building prior to manifested property damage. What the parties have failed to acknowledge, however, is that resolution of the trigger of coverage subissue does not in any way depend upon the unique features of a Sarabond claim. Simply put, the development and sale of Sarabond (and the etiology of damage) with resulting claims and lawsuits did not change the terms and meaning of the contracts between the parties. The type of claim involved, however, may be significant because public policy seems (at least in some courts' views) to play a more dominant role in establishing the trigger of coverage in some types of cases than in others.
Although the Sarabond claims underlying this coverage dispute may be massive and numerous, the Court recognizes that each Sarabond claim is, as one party suggested, a "garden variety" products liability property damage claim. No party has argued that the Court's decision on the trigger issue should logically be influenced by the number or magnitude of the claims involved. Cf. Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 27, 107 S.Ct. 1519, 1534, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring in the judgment) ("The principles which would have governed with $10,000 at stake should also govern when thousands have become billions. That is the essence of equal justice under law."). With these considerations in mind, the Court can undertake analysis of the trigger of coverage subissues.

II. Contractual Language and Law Governing the Trigger Issue
The parties all agree that Michigan's choice of law rules control every issue in this case, see Davis v. Sears, Roebuck and Co., 873 F.2d 888, 892 (6th Cir.1989), and that Michigan choice of law rules mandate interpretation of the relevant contractual language in this case under Michigan law. See, e.g., Leff v. NAC Agency, Inc., 639 F.Supp. 1426, 1428 (E.D.Mich.1986). Likewise, the parties seem to agree that there is but a single trigger of coverage for each underlying Sarabond claim. This agreement did not come about as a limitation on the Court's authority to decide issues, but rather as a consensus that the relevant insurance contracts will support no other reasonable construction. These basic rules provide the parameters for the Court's determination of the proper trigger of coverage.

A. The Various, Competing Trigger Theories
When analyzing trigger of coverage questions, courts have classified cases according to their results. See Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368, 1387 (E.D.N.Y.1988) (enumerating four principal trigger theories). If coverage is triggered at the time that personal injury or property damage becomes known to the victim or property owner, the approach is identified as the "manifestation theory." See, e.g., Eagle-Picher Indus., Inc. v. Liberty Mutual Ins. Co., 523 F.Supp. 110, 118 (D.Mass.1981), modified, 682 F.2d 12 (1st Cir.1982). If coverage is triggered when real personal injury or actual property damage first occurs, the approach is called the "injury in fact theory." See, e.g., American Home Prods. Corp. v. Liberty Mutual Ins. Co., 748 F.2d 760, 764-65 (2d Cir.1984). If coverage is triggered when the first exposure to injury-causing conditions occurs, then the court is said to have chosen the "exposure theory." See, e.g., Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1217, 1223 (6th Cir.1980), clarified on reh'g, 657 F.2d 814 (6th Cir.1981). Finally, if coverage is triggered in a manner such that insurance policies in effect during different time periods all impose a duty to indemnify, then the approach is labelled a "continuous" or "multiple" trigger theory. See, e.g., Keene Corp. v. Insurance Co. of *479 North America, 667 F.2d 1034, 1047 (D.C. Cir.1981).
In reality, reference to trigger theories is more useful in describing what has been decided than in determining what the decision should be in a given case. The Court can discern no consistent pattern in the myriad trigger cases that prescribes the specific trigger theory to apply in a specific type of case.[5] Furthermore, reference to trigger theories can be deceiving. Comparison of the manifestation theory with the injury in fact theory is absolutely meaningless unless there is some real possibility of a substantial time lag between the actual injury and the resulting manifestation. Similarly, comparison of the injury in fact theory with the exposure theory means nothing unless the advocate of the exposure theory presses for a ruling that coverage was triggered prior to the point when injury in fact occurred. Moreover, in all of these scenarios, "real" or "actual" injury must be defined in temporal relation to initial exposure or ultimate manifestation. Any effort to logically organize all of the trigger cases along these lines would be perforce ineffectual. Consequently, trigger rulings are most appropriately derived by reference to the operative policy language, as opposed to the judicial gloss placed upon similar language in ostensibly analogous cases.

B. The Approaches Proposed by the Parties
Dow's position on the trigger subissue is somewhat nebulous. Dow appears to propose a "single exposure  exposure to conditions" trigger theory, yet Dow labels its trigger theory "inception of injury." Not surprisingly, Dow acknowledges that property damage is required before coverage is triggered. Dow refines this concept by asserting that injury-causing exposure to conditions triggers coverage, and that the injury which is caused may only be minute. However, Dow also suggests that physical change which eventually leads to actual injury perhaps may also trigger coverage under its "inception of injury" theory.
The excess carriers' positions on trigger are not nebulous, but are somewhat ambivalent. The excess carriers seem to recognize that actual injury (whenever it occurs) triggers coverage, but they refuse to acknowledge that their trigger theory is really "injury in fact" rather than manifestation.
Fireman's Fund's trigger approach is neither nebulous nor ambivalent. According to Fireman's Fund, coverage is triggered by manifestation, and nothing else.
One additional observation about the defendants' positions is appropriate at the outset. The defendants have identified their trigger filings as motions with respect to the date of loss. The phrase "date of loss" does not appear in the policies, or at least in the portions of the policies that control the trigger issue. Although the phrase "date of loss" is used in many legal contexts, its use in this case does not aid the Court in resolving the issues under consideration. The Court deems it inappropriate to assign such an ambiguous label to an issue and then proceed to resolve the artificially created ambiguity.

C. Analysis of the Trigger Issue Under Michigan Law
The "trigger of coverage" subissue is a contract question, and in Michigan the meaning of a contract's language is a question of law "[i]f the language is unambiguous." Taggart v. United States, 880 F.2d 867, 870 (6th Cir.1989) (applying Michigan law); see also Jones v. Farm Bureau Mutual Ins. Co., 172 Mich.App. 24, 27, 431 N.W.2d 242 (1988) ("Construction of an insurance contract containing unambiguous language is a question of law for the court."). The parties generally support their trigger positions by referring to case law rather than the operative language of the contracts. In addition, Fireman's Fund relies heavily on the course of dealings between itself and Dow. The Court finds *480 the parties' primary reliance on such interpretive sources to be somewhat misplaced.
During oral argument and in this opinion, the Court has attempted to isolate the determinative words and phrases in the contracts, to discern whether they are ambiguous, and to ascertain what the key words and phrases mean without initial reference to case law. Cf. Jones, 172 Mich. App. at 27, 431 N.W.2d 242. After rigorous analysis of the dispositive contract language, the Court must turn to controlling precedent (if any) and to persuasive, nonbinding decisions for verification or modification of the Court's initial contractual interpretation.[6] The Court also must weigh policy considerations associated with the various trigger theories. Finally, the Court must examine Fireman's Fund's course of dealing argument. Throughout the opinion, however, the Court must seek guidance principally from the contractual language itself.

1. Policy Language
Fireman's Fund was Dow's primary general liability insurance carrier from 1956 through 1976. Policies in effect prior to 1964 are not relevant in this lawsuit. From 1964 through 1976, three primary policies governed the relationship between Dow and Fireman's Fund. The first policy covered the period from January 1, 1964 through July 30, 1970. The second policy was in force from July 30, 1970 to January 1, 1974. The third policy, which was written for the period from January 1, 1974 to January 1, 1977, was cancelled effective April 1, 1976.[7] The critical language from each of the three policies is set forth in Addendum B.
The three consecutive primary policies prescribe indemnity for each covered property damage claim up to $2.5 million per occurrence. The last two policies also contain aggregate limitations for certain specified types of claims. These two policies provide for automatic reinstatement at an additional premium.[8] If Dow is entitled to coverage of Sarabond claims on any of the three relevant Fireman's Fund policies, the time at which coverage is triggered may be significant not only with respect to excess coverage, but also with respect to the impact on the primary policy premiums. Conversely, deductibles in the primary policies are of no concern whatsoever as far as the trigger issue is concerned.
The Court need not examine Dow's excess general liability insurance policies in detail to decide the trigger issue. It is enough to note that the excess policies are triggered by the same event that triggers the primary policies because of the excess policies' "broad as primary" and "following form" provisions.[9]See, e.g., Industrial Risk Ins. v. New Orleans Public Serv., Inc., 666 F.Supp. 874, 876 (E.D.La.1987) (A "following form" policy "provide[s] coverage in accordance with the terms and provisions of the ... primary policy."). Thus, the Court must focus on the language of the relevant primary insurance policies.
The language of the 1974 Fireman's Fund primary policy may be combined to read as follows:
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage ... caused by ... an event, including *481 continuous or repeated exposure to conditions, which results, during the policy period, in ... physical injury to or destruction of tangible property ... not intended from the standpoint of the insured[.]
There is no substantial difference between this language and the language of the other two relevant primary policies. Although the concept expressed by these carefully selected words may be difficult to apply to some claims made against the policies, the meaning of the operative language is not ambiguous.
Absolutely nothing in the policy language suggests that an event can trigger coverage prior to the time that the event results in property damage. By the same token, nothing suggests that exposure to conditions triggers coverage prior to the time that property damage results from such exposure. Moreover, the policy language does not even hint that property damage must be known to anyone in order to trigger coverage. Likewise, nothing in the policy language indicates that property damage does not exist unless someone knows about it. The parties' suggested approaches, therefore, find no support in the relevant terms of the primary policies.
The Court is of the opinion that the plain language of the policies leads to several inescapable conclusions:[10]
(1) property damage triggers coverage;
(2) the property damage which triggers coverage is the property damage for which recovery was sought in the underlying claim;
(3) coverage is triggered when the physical injury to, or destruction of, tangible property that constitutes such property damage first occurs;
(4) an event (including exposure to conditions) which has not yet caused such property damage does not trigger coverage;
(5) property damage occurs when such injury or destruction first occurs, whether at the time of manifestation or prior to manifestation.
In short, the policy language supports an injury in fact trigger approach.

2. Relevant Cases
The cases cited by the parties in support of their divergent trigger theories can be divided into two categories: (1) Michigan decisions, which are binding if applicable, see Bailey v. V & O Press Co., Inc., 770 F.2d 601, 604 (6th Cir.1985) (discussing binding and nonbinding sources of state law); and (2) cases from jurisdictions other than Michigan, which at best provide persuasive authority. Because Michigan jurisprudence governs this lawsuit, see supra § II, introductory ¶, the Court must look initially to Michigan decisions in analyzing the relevant case law.

a. Michigan decisions
The parties have identified three Michigan cases as relevant to the trigger issue. See Frankenmuth Mutual Ins. Co., Inc. v. Eurich, 152 Mich.App. 683, 394 N.W.2d 70 (1986); Moss v. Shelby Mutual Ins. Co., 105 Mich.App. 671, 308 N.W.2d 428 (1981); Employers Mutual Liability Ins. Co. of Wisconsin v. Michigan Mutual Auto Ins. Co., 101 Mich.App. 697, 300 N.W.2d 682 (1980). In Eurich, the underlying claim was for fire damage. Eurich, 152 Mich. App. at 685, 394 N.W.2d 70. In Employers Mutual, the underlying claim was based upon personal injury resulting from a boat explosion. Employers Mutual, 101 Mich. App. at 699, 300 N.W.2d 682. Moss is another personal injury case where the injury resulted when a dock collapsed. Moss, 105 Mich.App. at 673, 308 N.W.2d 428.
The Court finds that none of the Michigan cases is of any real value in resolving the trigger question. All three decisions simply reject antecedent negligence as a trigger of coverage. See Employers Mutual, 101 Mich.App. at 703, 300 N.W.2d 682; Moss, 105 Mich.App. at 679-80, 308 N.W.2d 428 (adopting Employers Mutual *482 approach); Eurich, 152 Mich.App. at 687, 394 N.W.2d 70 (following Moss and Employers Mutual). In each of the cases, actual property damage and manifestation occurred simultaneously; none of the cases involved exposure to conditions that initiated gradual physical change.
In fact, the defendants' reliance on Eurich, Moss, and Employers Mutual merely demonstrates that there are neither any controlling Michigan decisions nor any cases from other jurisdictions applying Michigan law to the sort of gradually deleterious process that resulted in the claims underlying this coverage case. The Court, therefore, cannot identify any source of Michigan law that undermines the "injury in fact" approach to the trigger issue.

b. Noteworthy decisions from other jurisdictions
In support of their competing trigger theories, the parties have cited a plethora of case law. Indeed, their research is so exhaustive that the Court need not even discuss some of the less important cases that the parties have cited. Each of the various decisions directly discussing the competing trigger theories, however, warrants careful consideration. The Court will analyze these crucial opinions grouped according to the theories purportedly adopted in the cases.

(i) Exposure cases
Dow relies heavily on Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), clarified on reh'g, 657 F.2d 814 (6th Cir. 1981), as support for Dow's version of the exposure theory. Forty-Eight Insulations is a multiple-exposure personal injury case. Although one court has relied upon Forty-Eight Insulations as authority for the exposure trigger theory in a single-exposure personal injury case, see Hancock Laboratories, Inc. v. Admiral Ins. Co., 777 F.2d 520, 525 (9th Cir.1985), it is the Court's view that Forty-Eight Insulations has no legitimate application to Sarabondtype claims. Forty-Eight Insulations addressed insurance coverage in the context of a mass tort personal injury claim involving continuous or repeated exposures to asbestos. See Forty-Eight Insulations, 633 F.2d at 1218. The Sixth Circuit's decision based on Illinois and New Jersey law was significantly influenced by public policy. Id. at 1220-22. Such emphasis is not surprising. In mass tort personal injury cases the courts are concerned not only with the financial relationship between the insured and its carriers, but also with the maximization of protection to persons who suffered injury. See, e.g., Keene Corp., 667 F.2d at 1052 n. 42. In Forty-Eight Insulations, the court did not mask its result orientation. See Forty-Eight Insulations, 633 F.2d at 1221-22. The Sixth Circuit put the burden of its decision squarely on the insurance industry for adopting a standard policy that was inadequate to deal with the problem. See id. at 1223.
The case that best supports Dow's exposure trigger theory is Hancock Laboratories, Inc. v. Admiral Ins. Co., 777 F.2d 520 (9th Cir.1985), which is a single-exposure personal injury case. In Hancock the underlying claimant received a heart valve implant that was contaminated. The effects of the contamination were not immediately observed, but eventually resulted in replacement surgery. One insurer was on the risk when the contaminated valve was implanted, while a second insurer bore the risk by the time the replacement surgery occurred. Despite the absence of any finding as to when the underlying claimant began to encounter the difficulty that led to the replacement surgery, the Ninth Circuit seemed to infer that it was a continuous process overlapping both insurance policies, with coverage triggered at the inception. See id. at 524-25. By itself, Hancock would be a significant case from Dow's point of view. Hancock is truly supportive of Dow's position because it treats Forty-Eight Insulations as authority for the proposition that the exposure to conditions trigger theory applies to a single exposure if followed by gradual development of the resulting disease. See id. at 525. This is what distinguishes Hancock from the Michigan antecedent negligence cases. If Hancock were a Michigan property *483 damage case, the Court would be hard-pressed not to follow it as precedent for the single-exposure trigger theory. It is neither, and the Court is not.

(ii) Multiple-trigger cases
The multiple-trigger variation of the exposure theory minimizes the risk that some party will go without coverage and that some injured party will go without compensation.[11] This consideration appears to form the foundation of the decision in Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1045-46 (D.C.Cir. 1981). To apply the multiple-trigger reasoning to a single-trigger case such as this, however, involves great risk as a precedent because, as illustrated by some of the cases discussed in this opinion, single-trigger theories are blind and may cut both ways from case to case. The Forty-Eight Insulations court noted that the parties wanted an administratively manageable interpretation of their policies. See Forty-Eight Insulations, 633 F.2d at 1218. In this case, the parties have expressed concerns about the ease of administration and the cost of litigation, but none has informed the Court that it should opt for the other side's competing theory if the Court should reject their own theory. The Court finds no persuasive authority to support the application of the multiple-trigger theory in single-exposure property damages cases. That theory seems confined to asbestos and hazardous waste cases,[12] which in the Court's view are so unique and affected by public policy that they offer no persuasive authority for any of the possible trigger theories.

(iii) Manifestation cases
Fireman's Fund, the most zealous proponent of the manifestation theory, relies on Blue Streak Indus., Inc. v. N.L. Indus., Inc., 650 F.Supp. 733 (E.D.La.1986), as authority for its position. In Blue Streak, the insured argued for coverage by asserting that the underlying damage occurred in "`microtraumas' during the policy term[.]" Id. at 735. The Blue Streak court rejected this argument and denied coverage by concluding that "the `microtraumas' did not cause any discernable injury until the actual failure of the gears" after the policy period. Id. at 736. In reaching this conclusion, the Blue Streak court explained that "the viewpoint that an accident may be a gradual process and is covered by the policy period even if its results occur after the policy expires, is the minority view which this Court declines to follow." Id. Fireman's Fund embraces this language from Blue Streak as supportive of the manifestation trigger theory. Although Blue Streak is certainly inconsistent with Dow's exposure trigger theory as understood by the Court and outlined above, Blue Streak is not a holding that premanifestation injury in fact does not trigger coverage.
Likewise, American Home Assurance Co. v. Libbey-Owens-Ford Co., 786 F.2d 22 (1st Cir.1986), affords Fireman's Fund no succor in its effort to convince the Court that manifestation triggers coverage. In that case, the First Circuit reasoned that "the test for determining the date of the occurrence should be the time at which a reasonable person would be aware that a defect exists that may give rise to a cause of action." Id. at 30. This is the language of manifestation, but once again it is not a case that necessarily involved actual injury prior to manifestation. The same can be said of Bob Evans Farms, Inc. v. Excellent Builders, Inc., No. 84 C 506, 1988 WL 80137 (N.D.Ill. July 27, 1988) (available on Lexis and Westlaw), where Judge Conlon adopted the First Circuit's formulation without extensive discussion. In fact, Judge Conlon relied in part on Illinois statute of limitations cases as well as liability insurance law. Nowhere in the Bob Evans *484 opinion, however, is there any suggestion that injury in fact preceded manifestation, notwithstanding prelitigation fact arbitration.
In fact, few property damage cases deal specifically with the precise issue before the Court. Greenlee v. Sherman, 142 A.D.2d 472, 536 N.Y.S.2d 877 (A.D.3d Dept. 1989), comes as close to the Sarabond trigger issue as any. In Greenlee, a fire occurred in 1984 that was allegedly "caused by the improper installation of [a] flue pipe from the furnace [in 1980], which resulted in the exposure of a wooden joist to intense radiant heat while the furnace was operating." Id. 536 N.Y.S.2d at 878. As the Greenlee court explained, "[t]his exposure to intense heat allegedly caused a chemical process, known as pyrolisis, in the wooden joist which ultimately lowered the ignition temperature of the wood to the point where it was ignited by the flue pipe." Id. Thus, Greenlee involved significant undesirable change prior to manifestation. On close scrutiny, however, Greenlee differs from this case in one crucial respect. In Greenlee, the underlying claim was for damage to the house, which burned down, rather than for damage to the wooden joist, which slowly deteriorated due to the exposure to intense heat. Id. 536 N.Y.S.2d at 880. The Greenlee court carefully distinguished between injury to the joist (which was gradual) and injury to the house (which was immediate). Thus, the Court in Greenlee treated injury to the joist and injury to the house as separate injuries. Id. 536 N.Y. S.2d at 881. The Court suggested that coverage might well be available for the damage to the wooden joist, and concluded its analysis with the following comment:
the fire was not the "manifestation" of an injury sustained during the policy period, but the "manifestation" of the condition created by Sherman's negligence during the policy period.
Id. (emphasis in original). Greenlee, therefore, is in reality just like the Michigan cases discussed above where the injury did not occur prior to manifestation.
Finally, two brick spalling cases are worthy of comment largely because they are brick spalling cases. The significance at first blush of Home Ins. Co. v. Landmark Ins. Co., 205 Cal.App.3d 1388, 253 Cal.Rptr. 277 (1988), is the factual similarity of the claim underlying the coverage dispute to the Sarabond claims at issue in this coverage action. Seven years after a hotel was constructed, its exterior "began to visibly manifest deterioration in the form of concrete `spalling' (cracking and chipping)." Id. at 1391, 253 Cal.Rptr. at 279. The spalling resulted from the interaction of steel, air, sea water, and a chemical in the concrete. The contestants in the case were two first-party insurers, "one of which [was] on the risk on the date of the first manifestation of property damage, and the other on the risk after the date of the first manifestation of damage[.]" Id. at 1393, 253 Cal.Rptr. at 280-81. Because the case came to the appellate court on stipulated facts, which the court recognized as binding, the court was "not allow[ed] to consider the interesting question whether it is possible for the insured to have a covered loss when the loss is not reasonably observable by the insured during the period of the policy under which the insured seeks payment." Id. at 1392, 253 Cal.Rptr. at 279. Thus, the court explicitly recognized that it could not consider the possibility of a covered loss based on injury in fact not yet manifested. Not surprisingly under the circumstances, the court imposed coverage liability on the first-party insurer which was on the risk when the loss was first discovered. Id. at 1393, 253 Cal.Rptr. at 280-81. The significance of the case lies elsewhere. That is, the court clearly inferred that real injury occurred at some point prior to manifestation. Moreover, the court observed that "[c]ommon sense tells us that property damage cases, even those involving continuous damage like the one before us, differ from asbestos bodily injury cases where injury is immediate, cumulative and exacerbated by repeated exposure." Id. at 1395, 253 Cal.Rptr. at 281. In the final analysis, however, the case has no direct application to this Sarabond coverage dispute.
United States Fidelity and Guar. Co. v. American Ins. Co., 169 Ind.App. 1, 345 *485 N.E.2d 267 (1976), is significant only because it is a case concerning brick spalling and flaking. The case is put into proper perspective by a footnote in Trizec Properties, Inc. v. Biltmore Const. Co., Inc., 767 F.2d 810 (11th Cir.1985):
the Indiana court [in U.S.F. & G. v. American Ins. Co., 169 Ind.App. 1, 345 N.E.2d 267 (1967).] in no way deviated from the rule that the time of the occurrence `is not the time the wrongful act was committed but the time when the complaining party was actually damaged.' The damage in that case was the spalling of bricks in a building. Because this damage was aesthetic rather than structural, the court merely held the date of the damage was the time the spalling was first noticed. Prior to the date that this type of damage becomes apparent, the complaining party has simply suffered no injury. The [U.S.F. & G.] court did not rule that the occurrence must always be measured from the date of discovery or manifestation of the damage.
Id. at 813 n. 5 (citation omitted, emphasis in original). Trizec Properties itself was not cited by any party as an important trigger case apparently because none of the parties directly urged the Court to adopt an injury in fact trigger as distinguished from a manifestation trigger. According to Trizec Properties, "[t]here is no requirement that the damages `manifest' themselves during the policy period. Rather, it is the damage itself which must occur during the policy period for coverage to be effective." Id. at 813 (footnote omitted). In fact, the Eleventh Circuit characterized an argument that premanifestation injury does not trigger coverage under a comprehensive general liability ("CGL") policy as an attempt to change an occurrence policy into a "claims made" policy. See id. at 813 n. 6. Indeed, many cases cited by the parties bolster the Court's conclusion that the injury in fact trigger is most consistent with the CGL policy language.

3. Policy Concerns
Although the Court's analysis of the trigger issue is driven primarily by contractual terms and secondarily by case law, several policy considerations merit some attention. First, the Court notes the concept that the parties have identified by the descriptive yet pedestrian term of "cut-and-run"  cancellation of coverage once the first in a series of potential claims is filed. The policy implications of the "cut-and-run" concept have been cogently explained in the following terms:
In most cases, however, the manifestation rule would reduce coverage: insurers would refuse to write new insurance for the insured when it became apparent that the period of manifestations, and hence a flood of claims, was approaching.
Developments in the Law, Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1580 (1986); see also Hancock Laboratories, 777 F.2d at 525. The "cut-and-run" policy argument is impressive, but it would not cause the Court to reject the manifestation theory if such a theory could be readily squared with the policy language.
The second policy concern is purely pragmatic; application of the injury in fact trigger theory in this case will almost certainly prove to be a difficult task. Few property damage cases involve actual injury prior to manifestation, and few of them involve so many large claims as does this case. The Court, however, cannot alter the insurance contract terms because of the potential fact-finding difficulties associated with the approach that the terms mandate. The meaning of the contractual terms is, in the Court's view, the paramount concern. See, e.g., Jones, 172 Mich.App. at 27, 431 N.W.2d 242. For this reason, policy considerations cannot justify deviation from the injury in fact trigger approach.

4. The Parties' Course of Conduct
In the face of seemingly unambiguous contract language, Fireman's Fund urges the Court to consider evidence of the course of the parties' conduct.[13] Analysis *486 of the course of conduct, in Fireman's Fund's view, leads to the conclusion that manifestation of injury triggers coverage. The Court is compelled to reject Fireman's Fund's argument for two reasons. The Court's primary reason for eschewing Fireman's Fund's view stems directly from the Michigan parol evidence rule as applied to this case. Even if the Court could consider the extrinsic evidence as Fireman's Fund suggests, the Court would still apply the injury in fact trigger theory in light of the parties' historical treatment of claims.

a. Manifestation and the unambiguous policy language
Under Michigan law, if "the language to [a] contract is indefinite or ambiguous, and hence of doubtful construction, the practical interpretation of the parties themselves is entitled to great, if not controlling, influence." Detroit Greyhound Employees Federal Credit Union v. Aetna Life Ins. Co., 381 Mich. 683, 686, 167 N.W.2d 274 (1969); see also Goodwin, Inc. v. Orson E. Coe Pontiac, Inc., 392 Mich. 195, 209-10, 220 N.W.2d 664 (1974). Conversely, "[i]n the absence of ambiguity, the rights of the parties rest on the contract as written." In re Seitz Estate, 426 Mich. 630, 637, 397 N.W.2d 162 (1986) (quoting Vigil v. Badger Mutual Ins. Co., 363 Mich. 380, 383, 109 N.W.2d 793 (1961)); see also Stine v. Continental Casualty Co., 419 Mich. 89, 114, 349 N.W.2d 127 (1984); Taggart v. United States, 880 F.2d 867, 870 (6th Cir.1989). One variation on these standard rules that is peculiar to Michigan law has been tersely summarized by the Sixth Circuit:[14] "Under Michigan law, a court may consider extrinsic evidence of the intent of contracting parties where the evidence is not inconsistent with the terms of the written contract." Ford Motor Co. v. Northbrook Ins. Co., 838 F.2d 829, 833 (6th Cir.1988). Thus, absent ambiguity, the most generous reading of Michigan's parol evidence rule permits consideration of the course of conduct evidence if, but only if, it is "not inconsistent with the terms" of the operative policy. See id.
In this case, as the Court has repeatedly emphasized, the policy language unambiguously dictates application of an injury in fact trigger of coverage. Consequently, the Court must "enforce the terms of the contract as written" irrespective of any seemingly inconsistent course of conduct. Allstate Ins. Co. v. Freeman, 432 Mich. 656, 667, 443 N.W.2d 734 (1989). Michigan law simply does not permit the Court to weigh course of conduct evidence that is "inconsistent with the terms of the written contract." Ford Motor, 838 F.2d at 833. To the extent that Fireman's Fund identifies course of conduct evidence in support of a manifestation trigger, the Court must disregard Fireman's Fund's argument on its face and adhere to the injury in fact trigger dictated by the operative policy language.

b. Course of conduct evidence
Even if the Court could consider evidence of the parties' course of conduct, the outcome of this motion would be the same  injury in fact would be the Court's approach to trigger issues. The course of conduct between Dow and Fireman's Fund suggests no uniform mode of analysis.[15] If anything, the course of conduct indicates that the parties never meaningfully considered the propriety of the manifestation theory vis-a-vis the injury in fact standard without reaching an impasse. Rather, each side acquiesced in the other party's approach only when neither side could logically argue against the proposed treatment of a given claim. In the few instances when Dow and Fireman's Fund were at loggerheads *487 prior to this litigation, they tended to espouse views on trigger that were self-serving.
On close scrutiny, every single example that Fireman's Fund has cited as an adoption of manifestation by Dow actually amounts to nothing more than an implicit recognition of injury in fact. For example, in the so-called "burn foam" cases, the injury of which the claimants complained had manifested itself at the time of injury in fact. That is, the relevant damage became manifest at precisely the time that injury in fact occurred. Fireman's Fund seemingly concedes this point in attempting to analogize the Sarabond claims to the foam claims:
The analogy to Sarabond is clear: If someone sued Dow solely for diminished property value due to installation of Sarabond, Dow might argue for an "installation" date of loss.
See Fireman's Fund's Memorandum Supporting Partial Summary Judgment on Date of Loss at 51 (May 8, 1989). Indeed, the course of conduct in the "non-burn foam" cases strongly suggests that Dow would make precisely that argument.
In the "non-burn foam" cases where injury in fact and manifestation did not occur simultaneously, the parties wound up at an insoluble impasse. This resulted, in the Court's view, because of the clear distinction between injury in fact and manifestation in "non-burn foam" cases. The fact that Dow never contested Fireman's Fund's loss timing when injury in fact and manifestation simultaneously occurred is simply insignificant. From the parties' course of conduct, the Court deduces that injury in fact offered the path most often traveled by the parties. Fireman's Fund's attempt to glean any other meaning from cases such as the "burn foam" and "non-burn foam" claims is misplaced. The Court, therefore, finds absolutely no reason to abandon the injury in fact trigger theory based on the parties' course of conduct.

III. Summation
The Court's ruling constitutes a rejection of the exposure and manifestation theories, and an adoption of the injury in fact trigger theory. The contract language is clear on this point, and the case law generally supports the Court's chosen approach. Therefore, the contractual trigger of coverage is the property damage for which relief is sought in the underlying claims. The Court is satisfied that Dow's second amended complaint is sufficient to encompass indemnification based upon an injury in fact trigger theory even though Dow has urged the Court to adopt a different theory.
The record as it stands is insufficient for the Court to determine when an injury triggering coverage occurred with respect to any of the underlying claims. Moreover, the factual record is not yet developed to the point that the Court can define precisely what amounts to injury in fact. The Court is confident that the parties will be able to sharpen the injury in fact focus through further discovery and motion practice. An appropriate order will enter after the Court has resolved the balance of the parties' pending motions.

ADDENDUM A
Associated Indemnity Corporation and The American Insurance Company (collectively referred to as "Fireman's Fund Companies")
Aetna Casualty & Surety Company
American Home Assurance Company
California Union Insurance Company
Central National Insurance Company
The Home Insurance Company
International Surplus Lines Insurance Company (ISLIC)
Midland Insurance Company
Underwriters at Lloyd's of London and Insurance Companies Subscribing Policies CU 10086, CU 10087, CU 10088, K 25298, and UGL 0519 (collectively referred to as "the London insurers")

ADDENDUM B
The relevant language from the 1974 Dow-Fireman's Fund policy is as follows:

*488 I. COVERAGE A  PERSONAL INJURY LIABILITY
COVERAGE B  PROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage A. personal injury or
Coverage B. property damage
to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.
. . . . .
III. LIMITS OF LIABILITY
. . . . .
Coverages A and B  For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
. . . . .
DEFINITIONS
. . . . .
"occurrence" means an event, including continuous or repeated exposure to conditions, which results, during the policy period, in personal injury or property damage not intended from the standpoint of the insured; except that assault and battery committed by or at the direction of the insured in order to safeguard, preserve, protect or defend persons or property shall be considered an occurrence.
. . . . .
"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
The relevant language from the 1970 Dow-Fireman's Fund policy is as follows:
I. COVERAGE A  PERSONAL INJURY LIABILITY
COVERAGE B  PROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage A. personal injury or
Coverage B. property damage
to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.
. . . . .
III. LIMITS OF LIABILITY
. . . . .
Coverages A and B  For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
. . . . .

*489 DEFINITIONS
. . . . .
"occurrence" means an event, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage not intended from the standpoint of the insured;
. . . . .
"property damage" means injury to or destruction of tangible property;
The relevant language from the 1964 Dow-Fireman's Fund policy is as follows:
INSURING AGREEMENTS
. . . . .
Coverage B  Property Damage Liability [The Company agrees] [t]o pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon the insured by law, or assumed by the insured under contract or agreement for damages because of injury to or destruction of property, including the loss of use thereof.
. . . . .
CONDITIONS
. . . . .
Coverage B
The limit of property damage liability stated in the declarations as applicable to "each occurrence" is the total limit of the Company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as the result of any one occurrence. All such damages arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one occurrence or accident.
. . . . .
5. Other definitions
. . . . .
(b) Occurrence and Accident
The word "occurrence" as used in this policy, shall include a single occurrence or a single accident, or a series of them arising out of one event or disaster.
NOTES
[1] Myriad Sarabond claims are currently being pursued in various courts throughout the country. In the federal system, many cases have been consolidated on Dow's motion by the Judicial Panel on Multidistrict Litigation. See In re the Dow Chemical Co. "Sarabond" Products Liability Litigation, 650 F.Supp. 187 (J.P.M.D.L. 1986). Pursuant to 28 U.S.C. § 1407, the panel transferred a collection of Sarabond cases to the United States District Court for the District of Colorado, the forum for the multidistrict litigation. See id. at 189.
[2] The other four cases on the Court's docket are as follows: (1) File No. 85-10137 (declaratory judgment action re: duty to defend TDI actions); (2) File No. 85-10398 (Canada resin); (3) File No. 87-10091 (reinstatement); and (4) File No. 87-10282 (action seeking contribution for legal fees from Dorinco).
[3] Dow and its insurers have received mixed results in the cases that have gone to trial. In Central National Bank of Cleveland v. The Dow Chemical Co. (Ct. Common Pleas Cuyahoga Cty.), the jury returned a verdict against Dow for over $28 million. Dow appealed and eventually settled the case. In St. Vincent's Hosp. v. The Dow Chemical Co. (Johnson County Cir.Ct.), an Indiana state court jury returned a $6.7 million award. Recently however, a jury trial in C.A. Assocs. v. The Dow Chemical Co. (D.Colo.) ended with a verdict in Dow's favor.
[4] Throughout the lengthy discovery process, the Court has been immeasurably assisted by Professor Francis E. McGovern, Francis H. Hare Professor of Law at The University of Alabama School of Law, the special master in the various Dow cases.
[5] In certain types of cases, multiple-trigger theories are more likely to be applied. Also, there may be binding precedent in some jurisdictions that dictates application of a particular trigger theory in a specific type of case. These rudimentary points are illustrated by the cases subsequently discussed in this opinion.
[6] For the most part, the Court has limited its analysis to the cases upon which the parties have relied in their motions. Because none of the parties has advocated an injury in fact trigger theory, there is a paucity of injury in fact case law in this opinion. In light of the Court's selection of an injury in fact trigger, the Court is confident that the parties will hereafter rely upon cases that explain the subtle nuances of the injury in fact theory.
[7] There is no allegation that the policy was cancelled because of potential Sarabond claims.
[8] The 1970 policy provides that the amount of the premium for reinstatement is to be determined. Claims other than Sarabond claims, of course, count against the aggregate for any one year. The amount of the reinstatement premium of the 1970 policy is the subject of another suit in this Court which is scheduled for trial in the Fall of 1989.
[9] For this purpose, issues concerning the intended damage clauses are not considered to be trigger issues.
[10] The Court's conclusions are based strictly upon examination of the contract language. The Court's confidence in its interpretation, however, is reinforced by the Second Circuit's reasoning in American Home Prods. Corp. v. Liberty Mutual Ins. Co., 748 F.2d 760, 764 (2d Cir.1984) (rejecting manifestation and exposure theories in favor of injury in fact approach).
[11] Multiple-trigger theories create stacking problems, but these are of no concern in this case based on the Court's rejection of any and all multiple-trigger approaches.
[12] The only exception to this general rule is Gruol Constr. Co., Inc. v. Insurance Co. of North America, 11 Wash.App. 632, 524 P.2d 427 (1974), which involved progressive damage in the form of dry rot. After identifying three possible trigger theories, the Gruol court selected a multiple-trigger approach. The most that can be said for Gruol is that it provided an equitable result in an unusual situation.
[13] At oral argument, Fireman's Fund (and all other parties) seemed satisfied that the policy language should be viewed as unambiguous, although Fireman's Fund proposed an interpretation at odds with Dow's analysis of the purportedly unambiguous language. In this respect, Fireman's Fund's course of conduct argument ostensibly is an alternative position premised on the existence of ambiguity.
[14] Michigan law also provides that "extrinsic evidence is admissible to indicate the actual intent of contracting parties where there is potential ambiguity in the contract." Ford Motor Co. v. Northbrook Ins. Co., 838 F.2d 829, 833 (6th Cir.1988).
[15] The Court need not even address Fireman's Fund's course of conduct argument based on the Dow-Dorinco relationship. Such conduct obviously is of no value in interpreting the Dow-Fireman's Fund insurance policies.